IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOEL I. SHER,
Chapter 11 Trustee for TMST, Inc.,

    *Plaintiff*,

    v.

BARCLAYS CAPITAL, INC.,

    *Defendant*.

Civil Action No. ELH-11-1982

## MEMORANDUM OPINION

This case involves complex financial transactions and events that occurred amidst the 2007 collapse of the subprime mortgage and housing markets.[1]  The sums at stake are substantial and some of the terminology is not common parlance.  But, distilled to its essence, the case is little more than a contract dispute.

From 2005 to 2007, Thornburg Mortgage, Inc. ("Thornburg"), now known as TMST, Inc.,[2] entered into a series of financial transactions with defendant Barclays Capital, Inc. ("Barclays"), through which Thornburg financed its acquisitions of residential mortgage-backed securities.  Oversimplifying for the sake of brevity, Barclays provided a total of about $2.7 billion in financing to Thornburg, and Thornburg's promise to repay was secured by residential

---

[1] *See* Declaration of Lance Croffoot-Suede, Esquire (counsel for defendant), ECF 111-4; *see also* Press Release filed by Thornburg Mortgage, Inc. on August 14, 2004 with U.S. Securities and Exchange Commission, Def. Ex. 1, ECF 111-5.

[2] Thornburg's name was changed in connection with its Chapter 11 bankruptcy filing. *See In re TMST, Inc. f/k/a Thornburg Mortgage, Inc.,* No. 09-17787 (Bankr. D. Md. July 27, 2009).

mortgage-backed securities ("RMBS" or "MBS").[3]  The parties' relationship was governed by a

Master Repurchase Agreement ("MRA") executed in 2005 and a series of Confirmations.  *See*

MRA, Def. Ex. 4, ECF 111-8.

In mid August of 2007, Barclays issued a series of margin calls to Thornburg, in reliance

on the MRA, seeking additional collateral because, in Barclays' view, the value of Thornburg's

collateral had declined during increasingly turbulent economic conditions.  Thornburg disputed

Barclays' calculations of the value of the collateral and Barclays' contractual right to make those

calculations.  When Thornburg did not satisfy the margin calls, Barclays declared Thornburg in

default of its obligations, liquidated some of the MBS, and retained the remaining MBS in its

own inventory.  Barclays applied toward Thornburg's debt the proceeds obtained from the

liquidation sale, as well as a credit purporting to represent the value of the retained MBS.

Barclays then assessed two separate charges intended to offset the cost of prematurely unwinding

the parties' transactions.  Eventually, Barclays returned about $4 million in cash to Thornburg –

a sum far less than that to which Thornburg claims it was entitled.

On May 1, 2009, Thornburg filed a Voluntary Petition for Chapter 11 bankruptcy.  *See In*

*re TMST, Inc. f/k/a Thornburg Mortgage, Inc.*, No. 09-17787 (Bankr. D. Md. July 27, 2009) (the

"Bankruptcy Action").  On April 28, 2011, Joel I. Sher, as the Chapter 11 Trustee for Thornburg,

filed a Complaint in the Bankruptcy Court against Barclays.  ECF 1325 in the Bankruptcy

Action; *see also* ECF 7.[4]  The Complaint alleged "Breach of Contract" (Count I) and "Breach of

the Covenants of Good Faith and Fair Dealing" (Count II).  On August 1, 2011, this Court issued

---

[3] I will, of course, explain the nature of these transactions in more detail below.

[4] Thornburg's bankruptcy trustee, Sher, is the actual plaintiff in this case.  But, for convenience, I will refer to the plaintiff as "Thornburg."

an Order (ECF 4) granting the unopposed "Motion of Barclays Capital, Inc. for Withdrawal of Reference of Adversary Proceeding" (ECF 1).

Thereafter, on September 7, 2011, I denied defendant's Motion to Dismiss Count I of the Complaint, but granted defendant's Motion to Dismiss Count II.  I wrote, ECF 27 at 15: "[T]he claims for breach of contract and for breach of the implied covenants are based entirely on the same underlying factual predicates. The claims are, in effect, redundant and duplicative."

Currently pending before the Court is Barclays' Motion for Summary Judgment (ECF 111), which is supported by a Memorandum of Law ("Memo," ECF 111-1) and voluminous exhibits.  Thornburg opposes the Motion, and has also filed a Cross-Motion for Partial Summary Judgment.  ECF 115.  In support, Thornburg filed a Memorandum of Law (ECF 115-1) and hundreds of pages of exhibits.  Both parties also filed reply briefs in support of their motions; Barclays' Reply is at ECF 118 ("Def. Reply") and Thornburg's Reply is at ECF 122 ("Pl. Reply").[5]  A motions hearing was held on July 11, 2014, at which counsel presented oral argument.  For the reasons that follow, I will deny both motions.

## Factual Summary

Thornburg was a sophisticated real estate investment trust ("REIT") that invested in "mortgage-backed securities that represent interests in pools of ARM [adjustable-rate mortgage] loans." Declaration of Clarence G. Simmons III, Chief Financial Officer of Thornburg ("Simmons Dec.," Def. Ex. 6, ECF 111-10) ¶ 9; *see id.* ¶ 6.  Thornburg derived its earnings primarily from the "net spread" between the interest income it earned on MBS assets and the cost

---

[5] The parties' submissions were thorough and comprehensive, and the parties' arguments were well presented.

of financing used to acquire those assets.  *Id.* ¶ 10.  It paid its earnings out as dividends.
Simmons Dec. ¶ 11.

Thornburg obtained much of its financing by entering into repurchase (or "repo")
agreements.  *Id.* ¶ 17–19.  In effect, a repo transaction is a form of secured lending in which the
lender receives the securities as collateral.  In a standard repo agreement, the borrower is termed
the repo seller and the lender is termed the repo buyer.  In a repo transaction, the repo seller sells
securities to the repo buyer and simultaneously agrees to repurchase the securities at a future
date, known as the "Repurchase Date."  *See* Expert Report of Plaintiff's Expert Daniel I. Castro,
Jr. ("Castro Rep.," Pl. Ex. 382, ECF 115-77) ¶ 44.

Thornburg and Barclays entered into a repo agreement of this type when they executed
the MRA in 2005.  *See* MRA.  The MRA is a form umbrella agreement, based on the September
1996 version standard-form Master Repurchase Agreement issued by The Bond Market
Association.  It is governed by New York law.  *Id.* ¶ 16.[6]  Pursuant to the MRA, Thornburg, as
the repo seller, sold MBS to Barclays, the repo buyer, while simultaneously agreeing to
repurchase the same MBS on the Repurchase Date at a higher price (*i.e.*, the "Repurchase Price,"
which is the amount of the original loan, plus interest and financing costs).  Castro Rep. at ¶¶ 44–
45.  The MBS served as collateral to secure the repurchase transaction and Thornburg's
repayment of the loan.

In particular, between February and June 2007, the parties entered into eight repo
transactions, collateralized by the Thornburg MBS.  Each transaction is memorialized in a

_____

[6] Under Maryland law, "the parties to a contract may agree as to the law which will
govern their transaction."  *Bank of Am., N.A. v. Jill P. Mitchell Living Trust*, 822 F. Supp. 2d
505, 517 (D. Md. 2011) (internal quotation marks omitted).

written trade confirmation (collectively, the "Confirmations"). *See, e.g.*, Confirmation, Def. Ex. 7, ECF 111-11. Each Confirmation "supplements and forms part of, and is subject to, the Master Repurchase Agreement as entered into between [Barclays and Thornburg] as of June 15, 2005." *Id*.

Pursuant to Paragraph 4 of the MRA, Barclays was permitted to issue margin calls to Thornburg if the "Market Value" of the Thornburg MBS declined below the specified "Buyer's Margin Amount." MRA ¶ 4. If Barclays issued a margin call (assuming the margin call complied with the MRA), Thornburg was required to transfer additional cash or securities to Barclays to ensure that the loan was adequately collateralized. *Id.*[7] Margin calls made "at or before the Margin Notice Deadline" were required to be met "no later than the close of business in the relevant market on such day." MRA ¶ 4(c).

Specifically, Paragraph 4(a) of the MRA provides:

> If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

The parties' dispute focuses largely on the term "Market Value," which is a key determinant of Barclays' right to issue a margin call. In Paragraph 2(j), the MRA defines the Market Value of the MBS as "the price for such Securities on such date obtained *from a*

---

[7] Similarly, Thornburg was permitted to issue its own margin calls if "the aggregate Market Value of [the MBS] exceeds the aggregate Seller's Margin Amount." *Id.*

*generally recognized source agreed to by the parties* or the most recent closing bid quotation from such a source." MRA ¶ 2(j) (emphasis added). However, the MRA does not explicitly identify any party or entity as the "generally recognized source" for determination of the Market Value of the MBS, and the parties have opposing views on the issue.[8]

In any event, if Thornburg failed to meet a margin call, the MRA allowed Barclays to declare an Event of Default and to either (a) liquidate the MBS or (b) take the MBS into its own inventory and give Thornburg credit for the value of the retained MBS, with the amount of credit based on terms contained in the MRA. MRA ¶ 11. Paragraph 11(d) of the MRA states as follows:

> [T]he nondefaulting party, without prior notice to the defaulting party, may . . . (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder . . .

In the event of a default, the defaulting party would owe the non-defaulting party more than just the amount of the loan. The Confirmations state, *e.g.*, Confirmation at 5: "If an Event of Default is declared . . . under the Agreement, then in addition to any other amounts owing . . . in respect of the Transactions pursuant to the provisions of Paragraph 11 of the Agreement, the defaulting party shall owe the non-defaulting party an amount equal to Positive Termination Value (or the non-defaulting party shall owe the defaulting party an amount equal to the

---

[8] The MRA does not contain a dispute resolution provision.

Negative Termination Value) as of the date of such declaration."  Additionally, the first page of each Confirmation advised, *id.* at 1 (emphasis in original):

> **IN THE EVENT OF A DECLARATION OF AN EVENT OF DEFAULT, IN ADDITION TO OTHER AMOUNTS OWNING [sic] BY EITHER PARTY UNDER THE AGREEMENT, COUNTERPARTY MAY OWE [BARCLAYS] AN AMOUNT EQUAL TO THE "TERMINATION VALUE" (AS DEFINED BELOW).  THE TERMINATION VALUE WILL REFLECT CHANGES IN THE MARKET VALUE OF THE PARTIES' RESPECTIVE POSITIONS IN THE TRANSACTIONS (INCLUDING ANY EMBEDDED DERIVATIVES) AND MAY BE VOLATILE.**"

Termination Value represents the non-defaulting party's lost profits and out-of-pocket costs caused by the early termination of the transactions.  It is defined in the Confirmation as "the amount, determined by the Calculation Agent in good faith, necessary to compensate the non-defaulting party fairly for losses and costs . . . in connection with any early termination of the Transaction prior to the Final Repurchase Date as a result of the occurrence of an Event of Default."  *E.g.*, Confirmation at 4.   The calculation of Termination Value involves two components: 1) a value that represents the economic benefit to the non-defaulting party of the remaining term of the transaction; and 2) any out-of-pocket costs incurred by the non-defaulting party relating to the early termination.   *Id.*   Termination Value expressly excludes amounts payable under Paragraph 11 of the MRA (*i.e.* the Repurchase Price minus the value of any liquidated or retained MBS).   In the event of a default, the defaulting party would owe this Termination Value, in addition to the Repurchase Price.

In August 2007, the Thornburg MBS portfolio consisted of 13 non-agency or private-label RMBS, valued at about $2.7 billion.[9]   Barclays believed that, because of market turmoil, the MBS collateral declined in value.  As a result, it issued a series of margin calls to Thornburg.  On August 2, 2007, Barclays sent Thornburg a margin call of $49.8mm and asked if Thornburg agreed.  Pl. Ex. 8, ECF 115-10 ("Call today for 49.8mm.  Please let me know if you agree.").  Barclays later adjusted its calculations and reduced its call to 40.7m.  Pl. Ex. 332, ECF 115-67.  Thornburg met the revised call. Pl. Ex. 9, ECF 115-11.  On August 6, 2007, Barclays issued a margin call for approximately $5.5 million.  Def. Ex. 18, ECF 111-22.  Thornburg disputed the call and contended that Barclays was over collateralized.  Pl. Ex. 52, ECF 115-47.  Thornburg did not transfer any money or securities to Barclays.  *See* Def. Ex. 20, ECF 111-24.  On August 7, 2007, Barclays issued a margin call for approximately $5.2 million.  Def. Ex. 24, ECF 111-28.  Thornburg satisfied the margin call the following morning.  Def. Ex. 25, ECF 111-29.  On August 8, 2007, Barclays issued a margin call for approximately $45.3 million.  Def. Ex. 26, ECF 111-30.  Thornburg disputed the call, sent Barclays its own view of prices showing that Barclays was over-collateralized, and asked Barclays to return the excess collateral.  Pl. Ex. 123, ECF 115-53.  Barclays acknowledged that it had mismarked one bond causing "a large, erroneous margin call," and transferred collateral back to Thornburg late the following day.  Pl. Ex. 231, ECF 115-60; Pl. Ex. 63, ECF 115-48

On August 10, 2007, Barclays issued a margin call to Thornburg for approximately $7.8 million.  Def. Ex. 30, ECF 111-34 ("CALL TODAY FOR 7.8MM.").  Thornburg disputed the

---

[9] A non-agency RMBS lacks the guarantee of a federal agency.  *See Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 713–715 & n. 8, 9 (2nd Cir. 2013).

call, sent Barclays its prices showing that a margin excess existed in Thornburg's favor, and asked that the parties use a third party to provide marks. Pl. Ex. 127, ECF 115-54. Barclays reviewed its call but then refused to adjust it. Pl. Ex. 13, ECF 115-15 at 305–07. Thornburg did not satisfy the August 10 margin call. Def. Ex. 32, ECF 111-36; Def. Ex. 10, ECF 111-14 at 7.

On August 13, 2007, Barclays issued a margin call for approximately $3.7 million. Notably, Barclays asked whether plaintiff agreed. Def. Ex. 33, ECF 111-37 ("I have a call today for 3.7mm. Please let me know if you agree."). Thornburg disputed the call and sent its prices to Barclays showing a margin excess of $6.7 million in Thornburg's favor. Pl. Ex. 129, ECF 115-55 ("We are disputing your call again. Please see attached with marks we know that reflect current market."). Moreover, Thornburg again requested that the parties agree on a third-party source to resolve their dispute over the prices, and suggested using Citi, Merrill, or RBS. Pl. Ex. 130, ECF 115-56. Barclays told Thornburg it would only discuss the matter if Thornburg paid the disputed call. Pl. Ex. 19, ECF 115-21. Thornburg did not satisfy the August 13 margin call. Def. Ex. 10, ECF 111-14 at 10–11.

On August 14, 2007, Barclays sent Thornburg a margin call for $25 million and again asked if plaintiff agreed. Pl. Ex. 133, ECF 115-57 ("Call today for 25mm[.] Please let me know if you agree."). Later that day, at 11:02 a.m., Barclays issued a Notice of Default to Thornburg under ¶ 11(a) of the MRA. Pl. Ex. 117, ECF 115-51. The declaration of default was issued more than 24 hours after the August 13 margin call and more than two business days after the August 10 margin call. Def. Ex. 40, ECF 111-44.

The same day, prior to the close of business, Barclays proceeded with a Bids-Wanted-in-Competition ("BWIC") auction process to liquidate Thornburg's MBS. *See* MRA ¶ 11(d)(i). At

approximately 11:30 a.m. on August 14, 2007, Barclays sent out a BWIC announcement to about
1,000 individuals at more than 275 institutions, indicating that the entire portfolio would be sold.
*See* Report of Defendant's Expert George S. Oldfield ("Oldfield Rep.," ECF 111-2) at ¶¶ 117–18
& n.100.  The announcement indicated that the bidding would close at 1:30 p.m., meaning that
potential bidders had about two hours to decide whether to place a bid.  *See, e.g.*, Pl. Ex. 15, ECF
115-17.  Barclays later extended the deadline by fifteen minutes.  Def. Ex. 43, ECF 111-47.

Prior to the conclusion of the BWIC, representatives of Barclays and Thornburg
participated in a telephone conversation with senior representatives from Bear Stearns about the
possibility of Bear Stearns assuming Barclays' position in the Repurchase Transactions, *i.e.*,
Bear Stearns would satisfy Barclays and take over the collateral.  *See* Def. Ex. 11, ECF 111-15 at
71–73; Pl. Ex. 20, ECF 115-22 at 166:12-169:11.  However, for reasons that are disputed, the
transaction with Bear Stearns was not consummated and Barclays proceeded with the BWIC.
Barclays claims it had no obligation to jeopardize its own financial position by waiting to see
whether Bear Stearns would proceed with the deal.  In proceeding as with the liquidation,
Barclays claims that the market was volatile and it acted "[i]n the face of rapidly-deteriorating
market conditions, including the declining demand for non-agency RMBS . . . ."  ECF 111-1 at
10.

Ultimately, Barclays sold ten of the thirteen Thornburg MBS to third parties in the
BWIC.  It opted to retain the remaining three MBS for its own account.  *See* Def. Ex. 44, ECF
111-48.  In accordance with the MRA, Barclays credited Thornburg with the value of the
retained MBS, but the parties disagree as to whether the amount of the credit was proper.  The
amount of credit Barclays gave Thornburg for each of the retained MBS was equal to the highest

bid Barclays had received in the BWIC. *Id.* However, Thornburg contends that it was entitled to a credit based on a price from a generally recognized source, rather than a liquidation price. ECF 115-1 at 31. The credits amounted to $36.42 million less than the prices Barclays had attributed to the same MBS a few hours earlier in its margin call of August 14, 2007.

On August 23, 2007, Barclays sent Thornburg a "Demand for Payment" letter stating the BWIC had failed to recover all of Thornburg's obligations to Barclays and demanding that Thornburg pay a "Closeout Deficit" of $9,859,869. Pl. Ex. 281, ECF 115-66 at 2. The calculation of the "Closeout Deficit" incorporated a "Derivative Unwind Charge" of $15,887,656 and a "Repo Unwind Charge" of $2,762,389. *Id.*

However, on September 4, 2007, after Barclays received more of the principal and interest ("P&I") payments from the MBS, it advised Thornburg by letter that the Closeout Deficit had been satisfied and that Barclays was returning a net excess of $4,374,632 to Thornburg. Pl. Ex. 360, ECF 115-72. In other words, Barclays recovered the full amount of Thornburg's debt, with a surplus of approximately $4.3 million. Barclays returned this surplus to Thornburg in September 2007. Def. Ex. 45, ECF 111-49 at 4.

Additional facts are included in the Discussion.

### Standard of Review

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. It provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). A fact is

"material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex Corp.*, 477 U.S. at 322–24. Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 248. In other words, "[f]actual disputes that are irrelevant . . . will not be counted." *Id*.

In resolving a motion for summary judgment, a district court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Greater Baltimore Ctr. For Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). The court should "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted). But, in resolving a summary judgment motion, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

As the Fourth Circuit recently observed, Fed. R. Civ. P. 56 "is a mechanism to obviate trial . . . ." *Boyer-Liberto v. Fontainbleau Corp.*, ____ F.3d ____, No. 13-1473, slip op. at 9 (4th

Cir. May 13, 2014), *rehearing en banc granted* (July 1, 2014).  Indeed, "'the very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine issue for trial.'"  *Id.*, slip op. at 8-9 (quoting Advisory Committee's Notes to Fed. R. Civ. P. 56) (emphasis added in *Boyer-Liberto*).  In supporting or opposing summary judgment, a party must rely on facts that would be admissible at trial.  *Id.* at 9.  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment.  *Anderson,* 477 U.S. at 248.  In contrast, a court must award summary judgment if the evidence "is so one-sided that one party must prevail as a matter of law."  *Id.* at 252.  And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.*

In evaluating the parties' contentions, I must also consider basic principles of contract under New York law.  "It is axiomatic under New York State law, which the parties agree applies, that '[t]he fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties.'" *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (*quoting Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997)).  "The best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 569 (2002) (internal quotation marks omitted).  A contract that is "complete, clear and unambiguous on its face must be interpreted according to the plain meaning of its terms, without the aid of extrinsic evidence." *Abakan, Inc. v. Uptick Capital, LLC*, 943 F. Supp. 2d 410, 414 (S.D.N.Y. 2013) (quotation marks and alterations omitted).  If a contract "'is silent on a given issue, evidence of industry custom and

usage may be admitted to explain or supplement the contract, so long as such evidence is consistent with and does not contradict the express terms of contract.'" *Columbia Artists Mgmt., LLC v. Swenson & Burnakus, Inc.*, 2010 WL 1379737, at *1 n.3 (S.D.N.Y. Mar. 3, 2010) (quoting Willston on Contracts, 34:7 (4th ed. 2009)).

### Discussion

In its Complaint, Thornburg contends that Barclays breached the MRA in four distinct ways. First, Thornburg alleges that Barclays had no right to declare a default on August 14, 2007, because the margin calls Barclays issued were invalid. Specifically, Thornburg claims that, if the parties disagreed about the market value of the MBS, the MRA and market practice required the parties to consult on an agreed-upon third party to determine the market value of the MBS before Barclays could issue a margin call. Instead, Barclays issued certain margin calls based solely on its own calculations of the market value of the MBS—calculations with which Thornburg disagreed. Second, Thornburg contends that the BWIC was not "commercially reasonable" and was not conducted in good faith, as required by the MRA. Third, Thornburg alleges that, with respect to the three MBS Barclays retained, Barclays did not credit Thornburg with the price from a "generally recognized source," as required by the MRA. In Thornburg's view, the MRA prohibits Barclays from crediting Thornburg with liquidation prices. Fourth, Thornburg claims that the Derivative Unwind Charge assessed by Barclays was calculated improperly and that the Repo Unwind Charge assessed by Barclays was not permitted by the MRA.

As discussed, *infra*, Barclays has moved for summary judgment on all four issues. Thornburg opposes Barclays' motion, and has moved for partial summary judgment regarding

the first of the four issues set forth above.  In particular, Thornburg argues that it "is entitled to summary judgment that Barclays' designation as Calculation Agent for determining Termination Value was not an agreement that Barclays was the sole generally recognized source for establishing Market Value of the MBS for margin calls."  Opp. at 14.

1.

As noted, Thornburg alleges that Barclays breached the MRA by declaring a default on August 14, 2007, because the margin calls that led to the declaration of default were invalid. According to Thornburg, Barclays improperly refused to consult a recognized source when Thornburg disputed Barclays' calculations of the Market Value of the MBS, and then issued improper margin calls on the basis of those disputed calculations.  Barclays maintains that it is entitled to summary judgment on this issue because it complied with the parties' agreements when it issued the margin calls and when it defaulted Thornburg for missing those margin calls.

The key issue in dispute is whether Barclays had the contractual authority to establish unilaterally the Market Value of the MBS.  As noted, the MRA places that authority in the hands of a "generally recognized source agreed to by the parties."  MRA ¶ 2(j).  However, the MRA does not explicitly name a "generally recognized source."

Thornburg maintains that no such source was ever agreed upon.  It asserts, Opp. at 12: "In the absence of agreement on a generally recognized source for Market Value, market practice and the MRA required the parties to try to agree on Market Value, and, if they were unable to do so, to use an agreed third-party source to establish Market Value."

Barclays disagrees.  In its view, the parties *did* reach an agreement on the generally recognized source for Market Value, and the agreed-upon source was Barclays.  Although

- 15 -

Barclays acknowledges that the parties did not memorialize their agreement that Barclays would be the generally recognized source, it nonetheless insists that the evidence in the record can lead to only one conclusion: the parties agreed that Barclays would be "responsible for determining 'Market Value' on an ongoing basis over the course of the Repurchase Transactions." Memo at 6. In support of its contention, Barclays makes three arguments: (1) Barclays' designation as "Calculation Agent" for purposes of calculating "Termination Value" necessarily required it to calculate the Market Value of the MBS; (2) the parties' course of dealing compels the conclusion that Barclays was the agreed-upon "generally recognized source"; and (3) the MRA would be impracticable unless Barclays was the "generally recognized source."

Barclays insists that "the very purpose underlying the MRA's margin maintenance requirements – the protection of the Buyer's value in the transactions at issue – is defeated if a dispute resolution requirement is judicially superimposed on it." Def. Reply at 15; *see* Memo at 22–23. It adds: "Barclays would be left unprotected in the face of continuing declines in the market value of the Thornburg RMBS. Such a reading is contrary to the purpose and express terms of the MRA . . . ." ECF 118 at 15.

Before addressing Barclays' arguments, I will describe and define certain concepts and terms in the MRA and the Confirmations.

As noted, Paragraph 4(a) of the MRA permits Barclays to issue a margin call if "the aggregate Market Value [of the MBS] is less than the aggregate Buyer's Margin Amount . . . ." The terms "Market Value" and "Buyer's Margin Amount" are defined in the MRA and the Confirmations. Market Value is defined as "the price for such Securities on such date obtained

from a *generally recognized source agreed to by the parties* or the most recent closing bid quotation from such a source."  MRA ¶ 2(j) (emphasis added).

Buyer's Margin Amount, to which Market Value is compared in determining whether Barclays may issue a margin call, is defined in the Confirmations as "equal to the sum of (i) the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transactions as of such date, plus (ii) the Positive Termination Value (or minus the Negative Termination Value) on such date, as determined as if Buyer were the non-defaulting party."  *E.g.*, Confirmation at 4.  The Buyer's Margin Percentage is set in the Confirmations at 104.25%.  *E.g.*, *id.* at 3.  Thus, Buyer's Margin Amount is simply 104.25% of the Repurchase Price (*i.e.* amount loaned plus accrued interest on the loan), plus the Termination Value.

Termination Value is defined as "the amount, determined by the Calculation Agent in good faith, necessary to compensate the non-defaulting party fairly for losses and costs . . . in connection with any early termination of the Transaction prior to the Final Repurchase Date as a result of the occurrence of an Event of Default."  *E.g.*, *id.* at 4.  As Thornburg puts it, the Termination Value reflects "the relative economics of the derivatives on the unwinding or end of the repo transactions, along with certain out-of-pocket costs."  Opp. at 15.  The calculation of Termination Value includes, "without limitation," Confirmation at 4 (emphasis in original):

> (a) the amount that the non-defaulting party would be willing to pay, or require to receive from, a third party dealer ("Dealer") of recognized standing in the markets in which transactions similar to the Transactions are traded, in consideration of the Dealer entering into an agreement with the non-defaulting party that would have the effect of preserving for the non-defaulting party the economic equivalent of the non-defaulting party's rights and obligations under the Transaction for the period commencing on the date of such early termination and ending on the Final Repurchase Date and (b) any out-of-pocket hedging or unwind costs incurred by the non-defaulting party relating to such early termination, but excluding any amounts payable by either party to the other under Paragraph 11 of the Agreement

- 17 -

(regardless of whether or not amounts calculated to be owing under such Paragraph are actually paid in accordance therewith).

Putting all these components together, the MRA permitted Barclays to issue a margin call if the Market Value of the MBS fell below the sum of the Termination Value plus 104.25% of the Repurchase Price. With this background, I turn to Barclays' arguments.

Barclays' first argument, which it advanced in its submissions but did not press at oral argument, is based on its designation as the "Calculation Agent" "[f]or purposes of determining the Termination Value in connection with calculation of Buyer's Margin Amount." *E.g.*, Confirmation at 6. Barclays contends that its role as Calculation Agent necessarily entailed determining the Market Value of the MBS: "Because Barclays was the Calculation Agent for determining Termination Value, it was responsible for *regularly determining* if it was in a loss position. Thus, Barclays was also responsible for determining Market Value on an ongoing basis over the course of the Repurchase Transactions." Memo at 25 (emphasis in original).

Barclays' attempted syllogism is missing a step or three. Although it is clear that Barclays was responsible for calculating the Termination Value, it is not clear that the Market Value of the MBS is an input in that calculation. As outlined above, the Termination Value is calculated by adding the non-defaulting party's lost profits in the event of early termination to the non-defaulting party's out-of-pocket costs in the event of early termination. Barclays has not shown how the Market Value of the MBS enters into that calculation. Indeed, when asked at oral argument to explain how the Market Value of the MBS affects the calculation of Termination Value, counsel for Barclays advised that the answer was the subject of expert testimony—testimony which was not cited by Barclays in connection with the Motion. Moreover, rather than being a direct input into the calculation of Termination Value, the Market

Value of the MBS is *compared to* Termination Value (plus 104.25% of the Repurchase Price) in order to determine whether Barclays may issue a margin call.

As Thornburg put it, Opp. at 13: "Barclays mashes several concepts together to say that because the Calculation Agent determines [Termination Value], it also unilaterally determines the Market Value of the MBS . . . . Barclays is wrong as a matter of law because the contractual rights and duties of the Calculation Agent are wholly unrelated to determining the Market Value of the MBS."

Moreover, even if the Market Value of the MBS was an input into the calculation of Termination Value or otherwise impacted Termination Value, as Barclays claims is suggested by page 1 of the Confirmations, cited earlier, that would not necessarily make Barclays the sole determiner of Market Value. Just because Barclays has the right to put the numbers into the calculator to determine the strength of its position does not mean that, as a matter of law, Barclays has the unilateral right to determine those numbers. Instead, the MRA expressly gave that right to a "generally recognized source agreed to by the parties." Indeed, even if Thornburg were willing to concede that the MRA permitted Barclays to perform its own calculation of market value *for purposes of valuing its derivative positions and determining Termination Value*, it does not mean that Thornburg would be willing to make the more vital concession that Barclays can unilaterally determine Market Value for margin call purposes. In fact, it would be costly and impracticable for anyone other than Barclays to calculate Termination Value, as that would require Barclays to open its derivative positions for scrutiny from an outside party. On the other hand, requiring that Market Price be drawn from a third party source for only the purpose of margin calls would not present the same concerns.

To be sure, Barclays' designation as Calculation Agent would be evidence, at trial, that the parties intended for Barclays to calculate the Market Value of the MBS, either in the first instance or in the event of a dispute.  However, Barclays' designation as Calculation Agent does not, as a matter of law, make it the "generally recognized source" that calculates the Market Value of the MBS.

Barclays's second argument, on which it primarily relied at oral argument, is that the parties' course of conduct makes clear that the parties did, in fact, agree upon Barclays as the "generally recognized source" for the purpose of valuing the MBS, even though they did not memorialize such an agreement in writing.  According to Barclays, the MRA contemplated a meeting of the minds between the parties on the identity of the "generally recognized source," and Barclays maintains that the meeting of the minds occurred.  As evidence of an agreement upon Barclays as the "generally recognized source," Barclays points out that "there can be no legitimate dispute that (1) Barclays was, in fact, marking the Thornburg [MBS] to Market Value throughout the Repurchase Transactions; and (2) Thornburg accepted Barclays' determinations . . . until mid-August 2007 . . . ."  Def. Reply at 5.

At oral argument, Barclays seemed to acknowledge that ordinarily it is for the jury to resolve whether the parties reached a non-memorialized meeting of the minds.  If the Court were to decide this fact question, it would invade the province of the jury.  However, Barclays maintains that in this case there is no factual dispute, and that the undisputed course of conduct between Thornburg and Barclays supports only one conclusion—that Barclays was the generally recognized source agreed to by the parties.

- 20 -

Thornburg vigorously disputes that the parties' course of conduct evidences any such agreement. It asserts, ECF 115-1 at 26:

> The MRA required that the parties agree on a generally recognized source for determining the Market Value of the MBS for each call. When the parties disagreed about MBS valuation, market practice required them to negotiate over the value and, if that failed, to use an agreed third party to supply market value for the call. Ex. 382 at 122. Barclays refused to do this in violation of the MRA, but declared Thornburg in default anyway. It therefore had no right to default Thornburg under the MRA.

In my view, the course of conduct on which Barclays relies is not nearly as illuminating as Barclays suggests. Rather than evidencing a clear agreement that Barclays was the generally recognized source for valuing the MBS, the record evidence reveals that Barclays and Thornburg generally conferred or collaborated to determine the value of the MBS. For example, on May 29, 2007, Barclays issued a margin call for $17.2 million, stating: "Call today for 17.2mm. *Please let me know if you agree.*" Pl. Ex. 6, ECF 115-8 at 2 (emphasis added). Thornburg responded, "Let me take a look," to which Barclays responded, "Thank you." *Id.* On August 2, 2007, Barclays issued a margin call of $49.8mm and again asked if Thornburg agreed. Pl. Ex. 8, ECF 115-10 ("Call today for 49.8mm. *Please let me know if you agree.*" (emphasis added)). Barclays then revised that call, and again asked if Thornburg agreed. Pl. Ex. 332, ECF 115-67 ("Can you let me know if you can agree."). Thornburg met the revised call. Pl. Ex. 9, ECF 115-11. On August 8, 2007, Barclays called Thornburg for $45.3 million. Pl. Ex. 340, ECF 115-69. Thornburg disputed the call, sent Barclays its own view of prices showing that Barclays was over collateralized, and asked Barclays to return the excess collateral. Pl. Ex. 123, ECF 115-53. Barclays corrected an error in its spreadsheet that had led to the "large, erroneous margin call,"

and transferred collateral back to Thornburg late the following day.  Pl. Ex. 231, ECF 115-60; Pl. Ex. 63, ECF 115-48.

To be sure, Barclays did not always ask whether Thornburg agreed with its valuations of the MBS.  *E.g.*, Pl. Ex. 119, ECF 115-52 at 4.  And, from the parties' exchanges (and other evidence introduced by Barclays), a reasonable jury could conclude that Barclays was the agreed-upon generally recognized source.  But, the jury would not be *compelled* to reach such a conclusion.  Rather, a reasonable jury could view the exchanges between the parties and conclude that Thornburg agreed with the early valuations and thus had no reason to protest, but that the lack of a reason to protest did not amount to an agreement between the parties as to a "generally recognized source."  Just as parties to an arbitration agreement may resolve disputes without the help of an arbitrator, Thornburg and Barclays may have resolved their disputes without resort to or agreement upon the MRA's "generally recognized source."  Put another way, the parties may never have had occasion to reach an agreement on the generally recognized source because until August 2007, any disputes were amicably resolved.

In its third argument, Barclays urges the Court to rule that Barclays had the right to determine the Market Value of the MBS because, in its view, the MRA could not function otherwise: "[U]nder plaintiff's interpretation, Thornburg would have had the unilateral ability to forestall its obligation to meet margin calls simply by disputing Barclays' Market Value determination . . . which would render inoperable the MRA's absolute requirement that margin calls be satisfied without delay."  Def. Reply at 6 n.4; *see id.* at 5–7.  This contention is not persuasive, for numerous reasons.

Nothing prevented the parties from reaching an agreement in the MRA on a generally recognized source, before any disputes developed. Indeed, Thornburg did just that in some of its MRAs with other counterparties. For example, Annex I to Thornburg's MRA with Credit Suisse states that, "[w]ith respect to paragraph 2j of the Agreement, the pricing source of calculation of Market Value shall be Telerate, Reuters, or Bloomberg, or, if a price is not available from such pricing sources for particular Securities, Credit Suisse . . . shall be the pricing source." Credit Suisse MRA, Pl. Ex. 3, ECF 115-5 at 14. The motivation to reach such an agreement was present for both parties, as either could issue margin calls as the Market Value of the MBS changed. *See* MRA ¶ 4.

If the parties failed to agree in the MRA or elsewhere upon a generally recognized source, despite having ample motivation to do so, this does not entitle the Court to anoint Barclays as the generally recognized source. "It is a fundamental contracts principle that a 'court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case.'" *Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*, 537 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) (quoting *Cruden v. Bank of New York,* 957 F.2d 961, 976 (2d Cir. 1992)), *aff'd*, 572 F.3d 76 (2d Cir. 2009).

Moreover, the concern identified by Barclays is not compelling because New York law imposes a covenant of good faith and fair dealing onto every contract. *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 214 (S.D.N.Y. 2007). Therefore, any attempt by a repo seller (in this case, Thornburg) to improperly create margin call disputes in

order to prevent a repo buyer (in this case, Barclays) from exercising default remedies would be a breach of the underlying contract.

It is also noteworthy that the parties' experts, who are all well-credentialed,[10] disagree about market practice in the event of a dispute over the market value of MBS. For example, Thornburg's expert, Daniel Castro, stated that "[m]argin call dispute resolution usually involves bilateral negotiations and review by the parties" and that the creditor typically forestalls collateral liquidation for any amounts in dispute. Castro Rep. ¶ 73. Conversely, Barclays' expert, Peter Nowicki, asserts that "both MRA standard documentation and market practice are clear that the creditor has the right upon the borrower's default to liquidate the collateral to satisfy the borrower's obligation," and that the "alternatives asserted by Mr. Castro are, in my experience neither provided for in standard MRA documentation nor are they market practice for structured repo collateral of the type at issue here." Rebuttal Expert Report of Peter Nowicki, ECF 111-3 at ¶¶ 34–35.

In sum, the MRA provides that Market Value must be determined by a "generally recognized source agreed to by the parties," but the MRA and Confirmations do not specify that source. The parties certainly could have named such a source in the contract, but nothing in the plain language of the MRA or the Confirmations makes Barclays the "generally recognized source." And, the parties' course of conduct does not compel the conclusion that the parties agreed that Barclays would be that source. To the contrary, the question of whether Barclays was the agreed-upon "generally recognized source" turns on a factual dispute about, *inter alia*,

---

[10] The various expert reports, which outline the experts' credentials, are available at ECF 111-2 (George Oldfield); ECF 111-3 (Peter Nowicki); ECF 115-77 (Daniel Castro); and ECF 115-76 (Marc Packles).

the parties' course of conduct, the parties' intentions in entering the contract, and market practice. Accordingly, Barclays' motion for summary judgment on the propriety of its margin calls will be denied.[11]

Thornburg's cross-motion for partial summary judgment seeks a ruling that "Barclays' designation as Calculation Agent for determining Termination Value was not an agreement that Barclays was the sole generally recognized source for establishing Market Value of the MBS for margin calls." Opp. at 14. The cross-motion is simply the inverse of Barclays' argument regarding the role of the Calculation Agent. I have already rejected Barclays' argument. As a result, a ruling on Thornburg's cross-motion would simply duplicate what I have already stated; it would not advance the litigation. If I rule that a coin came up tails, nothing is advanced by a second ruling that the coin did not come up heads.

At oral argument, Thornburg explained that the purpose of its motion was to prevent Barclays' experts from testifying at trial, and Barclays from arguing at trial, that Barclays' role as Calculation Agent *ipso facto* made Barclays the agreed-upon generally recognized source. Thornburg highlights a portion of the expert report of Peter Nowicki, a defense expert: "The

---

[11] On May 6, 2014, Thornburg submitted a Notice of Supplemental Authority (ECF 125), alerting the Court to the case of *1861 Capital Master Fund LP v. Wachovia Capital Markets, LLP* ("*1861 Capital Master*"), 934 N.Y.S.2d 35 (N.Y. Sup. Ct. 2011), *aff'd as modified*, 944 N.Y.S.2d 121 (N.Y.A.D. 2012). Barclays filed a response to the Notice (ECF 127), arguing that *1861 Capital Master* is irrelevant because the parties in that case did not have any course of conduct under the MRA.

In *1861 Capital Master*, a judge of the New York Supreme Court (a trial court) held that the defendant breached the MRA by insisting that only its own trading desk could unilaterally establish Market Value of the repo collateral for margin calls. *Id.* at *1. In my view, the case is not helpful here. The defendant in that case conceded that the parties never agreed on a generally recognized source. Here, by contrast, Barclays insists that Thornburg agreed Barclays would be the generally recognized source. *1861 Capital Master* offers nothing to help resolve the factual dispute between the parties about whether they agreed on a generally recognized source.

Thornburg/Barclays confirmation established Barclays Capital Inc. as the named Calculation Agent for purposes of determining the Termination Value and thereby established Barclays as the generally recognized source for calculating margin." Report of Defendant's Expert Peter Nowicki ("Nowicki Rep.," ECF 111-3) at ¶ 55.

To address its concern, Thornburg may file a motion in limine to exclude any testimony it believes to be inconsistent with this Memorandum Opinion or any other rulings in the case. However, the cross-motion serves no purpose, and it will be denied.

## 2.

As noted, Barclays sold ten of the thirteen Thornburg MBS to third parties through the BWIC. In its Complaint, Thornburg alleged that Barclays' sales of the MBS in the BWIC did not comply with the MRA because the sale was not commercially reasonable.

In seeking summary judgment, Barclays maintains that its sale of MBS complied with the MRA. *See generally* Memo at 30–43. Specifically, Barclays argues that "the MRA affords broad discretion to the non-defaulting party in exercising its default rights, and that discretion is conditioned only on the sale *either* (1) occurring in a 'recognized market,' or (2) otherwise being conducted in a 'commercially reasonable manner.'" Memo at 31–32 (quoting MRA ¶ 11(d)(i)) (emphasis in Memo). Barclays claims that "the satisfaction of either of those two conditions would suffice to grant summary judgment in Barclays' favor, based on the record evidence," and that "both are readily met here." Memo at 32.

Barclays argues that it sold the MBS in the only "recognized market" for the MBS, thereby satisfying Paragraph 11(d)(i)(A) of the MRA. *See* Memo at 32 ("BWIC sales are conducted in the over-the-counter market, which is the only recognized market for sales of

- 26 -

[MBS].").  Barclays adds that its liquidation was conducted in good faith and consistent with market practice.  Memo at 34.  It also insists that the liquidation itself was commercially reasonable and that it was not required to delay the liquidation to await an offer from Bear Stearns.  *Id.* at 35–38.  And, it points to Barclays' return of $4.37 million to Thornburg as evidence of the success of the liquidation.  *Id.* at 33.

Thornburg does not dispute that the MBS were sold in a recognized market.  *See* Opp. at 27.  Moreover, the parties appear to have stipulated in the MRA that the MBS regularly traded in a "recognized market."  Paragraph 11(d) of the MRA states: "Unless otherwise provided in Annex I, the parties acknowledge and agree that [] the Securities subject to any Transaction hereunder are instruments traded in a recognized market . . . ."  The parties did not modify this provision in Annex I or elsewhere.

However, Thornburg argues, *id.*: "Regardless of whether the collateral is sold in a recognized market . . . the defaulting party is required to conduct a commercially reasonable liquidation."  Paragraph 11(d) of the MRA provides that, in the event of a default, the nondefaulting party may "immediately sell" the MBS "in a recognized market (or otherwise in a commercially reasonable manner) . . . ."  This language seems to suggest that a sale in a recognized market is *per se* commercially reasonable.  However, in light of the implied covenant of good faith and fair dealing, the better interpretation of the MRA is that a sale in a recognized market is *presumptively* commercially reasonable, subject to rebuttal of that presumption.

Making reasonableness a presumption, rather than a *per se* rule, prevents a seller from somehow rigging the sale to harm its counterparty.  *See Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.,* 873 F. Supp. 808, 815 (S.D.N.Y. 1994) ("A party may be in breach of

its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations").  Such an interpretation is also consistent with the 1996 Securities Industry and Financial Markets Association ("SIFMA") Guidance Notes to the MRA, which state: "A clause had been added to Paragraph ii(d)(i) to make it clear that any sale of Purchased Securities by the nondefaulting party must be conducted in a commercially reasonable manner."  Pl. Ex 14, ECF 115-16 at 6.    Moreover, Barclays itself characterizes a sale in a recognized market as presumptively reasonable, rather than as *per se* reasonable.  *See* Def. Reply at 14.

Thus, the issue before the Court is whether the undisputed facts show that Barclays sold the MBS in good faith and in a commercially reasonable manner.   Thornburg contends that "Barclays set out to—and did—profit from distress in the financial markets by creating buying opportunities through a commercially unreasonable sale."   Opp. at 27.   In its view, Barclays' "two-hour lunchtime liquidation of $2.7 billion in collateral was not commercially reasonable," as required by the MRA.  Opp. at 31.  In essence, Thornburg's claim is that Barclays structured the auction to draw unreasonably low bids so that Barclays could retain some of the MBS for itself, credit Thornburg only with the amount of those low bids, and then re-sell those same MBS for higher prices.  *See* Opp. at 27–35.[12]

---

[12] It is unclear whether, how, and at what price Barclays later sold the three MBS it initially retained.  At oral argument, in response to the Court's inquiry, counsel for Barclays said, Transcript at 109: "[I]t's not crystal clear in terms of what happened to these specific securities because they're all part of a bigger portfolio.  So it gets even more complicated."  However, counsel for Barclays also suggested that Barclays would offer some evidence at trial on the issue, stating, *id:* "But the testimony will show, generally speaking . . . , about what happened in this marketplace. It wasn't as if Barclays was the only one with securities like this."  Counsel for Thornburg interjected, saying, *id.* at 109–10: "I just want to put on the record, we will object to that evidence coming in because we have asked for that repeatedly in discovery. They have refused to provide it, what they sold them for, refused to provide it, saying it's not relevant."

In support of its contention, Thornburg points out that, four days before Barclays declared Thornburg in default, "Barclays' head of repo trading Tim Keenan discussed how Barclays could profit from defaults in the MBS market . . . by defaulting counterparties and buying back bonds at a price of 80 that they had previously sold at 100." Opp. at 27–28. Thornburg quotes an audio recording of Keenan agreeing with a colleague who suggested, Pl. Ex. 12, ECF 115-14 at 13:10-13:35:

> The ultimate scenario is the banks just keep blowing up people until they're comfortable and then they own all the assets because there's no point in selling them. So they're basically taking all that shit back into their balance sheets they sold all their clients [] over the last 5 years at 100, they bought it all back at 80, they'll still make a fortune, right?

According to Thornburg, "[t]hat is exactly what Barclays did four days later when it defaulted Thornburg." Opp. at 28.

In the same vein, Thornburg notes that, before the liquidation, two Barclays traders discussed the possibility of retaining the MBS if the auction generated low bids. Richard Chung, the Barclays trader who had been pricing the MBS, testified at his deposition that Barclays internally discussed retaining any of the MBS if bid prices were 92 or lower. Deposition of Richard Chung ("Chung Dep.," Pl. Ex. 22, ECF 115-24) at 174.

Thornburg argues that Barclays structured the BWIC to ensure that it would only receive below-market bids. It points out that "numerous distributions of [the] BWIC list contained the additional statement 'WELCOME TO LIQUIDATION TIME! NONAGENCY ARMS, COME AND GET 'EM," which, according to Thornburg, "highlighted to all bidders that this was a distress sale, thereby effectively chilling the possibility of obtaining a true arms-length sale for fair value." Opp. at 29; *see* Pl. Ex. 15, ECF 115-17. Thornburg's expert, Dan Castro, testified at

his deposition that the BWIC auction was not commercially reasonable because of Barclays' "failure to employ normal safeguards to ensure the integrity of the auction and prevent self-dealing, the insufficient time Barclays provided for bidders to respond to the bid list, and the lack of information Barclays provided about the bid list." *Id.* at 31.  According to Castro, whose report expounds upon these concerns in detail, shortcomings of the BWIC auction "resulted in poor auction participation and sales that were below the price that Barclays would have obtained in a commercially reasonable sale." *Id.* at 32; *see* Castro Rep. at ¶¶ 134–46.

According to Thornburg, the proof is in the pudding.  After the auction ended, Tom Hamilton, Chung's boss, asked Chung about the auction, as follows:  "Do you think you stole some stuff?"  Pl. Ex. 24, ECF 115-26, at 6:16.  Chung responded that Barclays had "definitely" done so and that there was "no doubt in [his] mind" that Barclays was going to make ten points when it resold one of the bonds (*i.e.*, it could sell for 95 what it retained at 85).  *Id.* at 6:20. Chung estimated that Barclays would make "fifteen points" on another of the retained bonds and was "fairly confident" that Barclays would make at least two points on the third.  *Id.* at 6:44. Chung explicitly described the prices at which Barclays retained the MBS as "retarded," stating, "and I don't use that word often.  I mean, this is stupid."  *Id.* at 4:00.

Similarly, Thornburg submits that other participants in the auction were able to re-sell the MBS they purchased immediately after the sale.  For example, at least one third-party bidder told Chung via a recorded telephone call a few hours after the liquidation that he had already made a profit by re-selling the MBS.  Chung responded, "I hope you guys fucking killed it," and "that's great, that's awesome, that's what you're supposed to do."  Pl. Ex. 32, ECF 115-34 at 3:16.

Barclays disagrees with Thornburg's expert and Thornburg's analysis. It claims: "There can be no dispute that Barclays conducted a commercially reasonable liquidation." Memo at 35. According to Barclays, the BWIC is "a standard method of selling large securities positions in a prompt, efficient way." *Id.*; *see* Nowicki Rep., ECF 111-3 at ¶ 50; *see also* Deposition of Stephen Cozine, MBS trader for Barclays ("Cozine Dep.," Def. Ex. 12, ECF 111-16) at 12–14; Deposition of Patrick Feldman, Thornburg Assistant Portfolio Manager, Def. Ex. 61, ECF 118-5 at 128. Moreover, Barclays underscores that the value of the MBS was declining and market conditions were worsening. Memo at 35. It asserts: "Barclays needed to make a critical choice: (1) commence an immediate sale under the MRA, or (2) assume the risk of further market deterioration, which could have left Barclays dramatically under-collateralized and Thornburg owing great sums of money to Barclays after the liquidation." Memo at 35 n.45 (citing Cozine Dep. at 98–99). According to Barclays, the decision to conduct a BWIC was "made after extensive consultation with appropriate personnel within Barclays' legal, compliance, credit, sales and trading functions." Memo at 35 n.45 (citing Deposition of Timothy Keenan, trader at Barclays ("Keenan Dep.," Def. Ex. 11, ECF 111-15) at 13–14, 16–17; Deposition of Kashif Zafar, trader at Barclays ("Zafar Dep.," Def. Ex. 39, ECF 111-43) at 93–100.

Barclays emphasizes numerous facts that it believes support its argument that the BWIC was commercially reasonable: (1) it distributed the bid lists to almost "1,000 individuals at more than 275 different institutions," Memo at 36; *see* Oldfield Rep. at ¶¶ 117–18; (2) "the bid list was sent to most of the major institutions that operated as principal traders in the [MBS] market, including Barclays' competitors, who would also have reached out to a population of additional bidders in their capacities as broker-dealers," Memo at 36; *see* Oldfield Rep. at ¶¶ 117–18;

Rebuttal Expert Report of defense expert George S. Oldfield ("Oldfield Rebuttal," ECF 111-2) at ¶ 37; (3) Barclays extended the bidding by an additional fifteen minutes in response to feedback from bidders, Memo at 37; *see* Def. Ex. 43, ECF 111-47; and (4) the BWIC raised enough money that Barclays was able to fully recover Thornburg's debt and return more than $4.3 million to Thornburg. *See* Def. Ex. 45, ECF 111-49. In addition, Barclays posits that the covenant of good faith is not violated when a party acts "'in its own self-interest consistent with its rights under the contract.'" Def. Reply at 26 n.22 (*quoting Barbara v. MaxineMax, Inc.*, 2013 WL 1952308, at *5 (E.D.N.Y. May 10, 2013) (citation omitted)).

Moreover, other comments made by Chung during the telephone conversation discussed earlier may lead the jury to conclude that Barclays was acting in good faith. For example, when the third-party bidder asked why Barclays had not retained all of the MBS for its own portfolio instead of holding the BWIC, Chung replied: "We have a fiduciary responsibility, right? That's why we have to put it out to everybody. Personally, if it were up to me, I'd be the only one bidding it. [Laughter]. And then I'd hold a bid list of my own. But that's not in the best interest of the firm or the customer." *Id.* at 1:05.

It is clear that the parties and their experts disagree about the reasonableness and good faith of Barclays' auction process. Thornburg has proffered evidence suggesting that Barclays set out to profit from the liquidation of the MBS at Thornburg's expense; that Barclays intentionally structured the auction in a manner that would generate low bids; that third parties who purchased the MBS at auction were able to flip those same MBS at a profit shortly after the auction; and Barclays' traders bragged immediately after the auction that Barclays obtained the MBS at deflated prices and Barclays would be able to make a quick profit on the MBS it

retained.  For its part, Barclays disagrees with the veracity and probative value of the evidence proffered by Thornburg.  Barclays has proffered evidence suggesting that, given the turbulence in the market generally and because of Thornburg's precarious financial condition, it acted in good faith and rightfully took the course it felt would best protect its own interests.  Further, Barclays maintains that the record contains evidence supporting the conclusion that the auction process was commercially reasonable, including the fact that numerous entities and individuals had a chance to submit bids and that the prices generated by the BWIC were sufficient to recover the full amount of Thornburg's debt.

The case of *Primavera Familienstifung v. Askin* is instructive.  130 F. Supp. 2d 450 (S.D.N.Y. 2001), *amended on reconsideration in part*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001) and *abrogated on other grounds by Casey v. Merck & Co., Inc.*, 653 F.3d 95 (2d Cir. 2011). *Primavera* arose out of transactions similar to those here—repurchase transactions with mortgage-backed securities.  The plaintiffs were investment funds ("Funds") that defaulted on loans from defendant broker Merrill Lynch ("Merrill").  Merrill subsequently conducted a liquidation sale of the mortgage-backed securities.  The Funds sued, alleging, *inter alia*, that Merrill's liquidation sale was conducted in bad faith.  In response to Merrill's motion for summary judgment, the Funds proffered evidence that the liquidation sale resulted in below-market prices, that the auction was too short for other brokers to formulate bids, and that Merrill purchased some of the securities at auction and then immediately re-sold them at a profit to one of its customers, TCW.  *Primavera*, 130 F. Supp. 2d at 480–81.

Merrill moved for summary judgment, which the court denied.  It reasoned, *id.* at 550:

> Merrill is correct that its failure [to obtain fair market value for the securities] does not in and of itself warrant a finding of bad faith.  However,

evidence on this matter . . . , including Merrill's participation in the auction, the TCW resales, the restriction of the auction to certain broker-dealers, and the amount of time allowed for the formulating of bids . . . is sufficient to give rise to a genuine dispute of material fact as to whether Merrill's liquidation was consistent with the implied covenant of good faith and fair dealing.

The same rationale governs here. The parties have generated numerous factual disputes that bear on the question of whether Barclays conducted a good faith liquidation of the MBS in a commercially reasonable manner. In my view, there are genuine disputes of material fact, and therefore the issue is not appropriate for resolution by the Court. Accordingly, I will deny Barclays' motion for summary judgment on the reasonableness of its liquidation sale. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

3.

As noted, Barclays retained three of the MBS for its own account and credited Thornburg with an amount equal to the highest bid received in the BWIC. Thornburg contends that Barclays violated the MRA by crediting it with the BWIC price, rather than a price obtained from a "generally recognized source." Opp. at 36. The relevant provision of the MRA, Paragraph 11(d)(i), provides that Barclays may "in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source."[13] According to Thornburg, "there is no dispute – and both parties' experts agree – that a liquidation price is not a price from a generally recognized source." Opp. at 35.

---

[13] Unlike the "generally recognized source" referenced in ¶ 2(j) of the MRA, the "generally recognized source" referred to in ¶ 11(d)(i) need not be "agreed to by the parties."

Barclays argues that several of the bidders in the BWIC were generally recognized sources for pricing MBS and, therefore, the prices set in "the market by conducting the BWIC auction process" were prices from a "generally recognized source."  Def. Reply at 21. According to Barclays, "[p]laintiff's argument that the price to be paid by Barclays should be higher than the price set by the market is illogical and not supported by the terms of the MRA." *Id.* at 21–22.  Accordingly, Barclays maintains that it is entitled to summary judgment on this aspect of Thornburg's suit.

Barclays' argument only holds water if the BWIC was commercially reasonable and conducted in good faith.  However, for the reasons discussed earlier, the questions of Barclays' good faith and whether the BWIC was commercially reasonable are matters for the jury.  Thus, the question of whether the prices obtained at the BWIC represent the prices from a "generally recognized source," as required by the MRA, is also a question of fact for the jury.  Accordingly, the motion for summary judgment on this issue will be denied.

4.

After the declaration of default and liquidation of the MBS, Barclays charged Thornburg a "Derivative Unwind Charge" of $15,887,656 and a "Repo Unwind Charge" of $2,762,389. Thornburg alleged that Barclays failed to determine the Derivative Unwind Charge in good faith and that "there is no contractual basis for the Repo Unwind Charge."  Opp. at 40; *see* Complaint at ¶ 2.  Barclays has moved for summary judgment, contending that "the MRA and related Confirmations include broad damages provisions" and that "Thornburg will be unable to demonstrate that Barclays acted in bad faith."  Memo at 43–44.

In the event of a default, Barclays was entitled to recover not only the value of the loan, but also the Termination Value. Its right to do so is set forth in the Confirmations, which contain a section titled "Payments Upon Event of Default." That section states: "If an Event of Default is declared . . . under the Agreement, then in addition to any other amounts owing by either party to the other in connection with such declaration . . . the defaulting party shall owe the non-defaulting party an amount equal to Positive Termination Value . . . as of the date of such declaration." Confirmation at 4. Termination Value in the event of a default is the same as Termination Value for purposes of margin call, and it is determined by the "Calculation Agent in good faith." *E.g.* Confirmation at 3. As discussed, Termination Value includes, *id.*,

> the amount that the non defaulting party would be willing to pay, or require to receive from, a third party dealer ("Dealer") . . . in consideration of the Dealer entering into an agreement with the non-defaulting party that would have the effect of preserving for the non-defaulting party the economic equivalent of the non-defaulting party's rights and obligations under the Transaction.

When Barclays calculated the Termination Value after the default, its calculation included a "Derivative Unwind Charge" and a "Repo Unwind Charge." I will address each of the charges separately, beginning with the Derivative Unwind Charge.

In each of the repo transactions, Barclays offered Thornburg a low initial floating interest rate (below LIBOR), followed by a fixed interest rate. In order to offer these rates to Thornburg, Barclays' repo desk entered into a series of internal transactions with Barclays' swaps desk. In these internal deals, the Barclays repo desk agreed to pay the Barclays swaps desk the interest rates Thornburg agreed to pay, and the swaps desk agreed to pay the repo desk the interest rate the repo desk wanted. The Derivative Unwind Charge compensated Barclays for the expense of the early termination of these internal transactions. *See* Zafar Dep. at 45–46; Deposition of

Manish Saraf, Barclays' corporate representative ("Saraf Dep."), Def. Ex. 46, ECF 111-50 at 255–57.   Thornburg does not dispute Barclays' contractual right to charge Thornburg a derivative unwind charge of this nature.   However, Thornburg alleges that Barclays calculated the Derivative Unwind Charge in bad faith.

In order to calculate the Derivative Unwind Charge, Barclays used a computer model to determine the "mid-market price" for the expected cost of replicating a set of derivatives with the same characteristics as the Thornburg transactions.   Saraf Dep. at 28.   Barclays then added a risk premium to its calculation.   The same computer model that calculated the mid-market price also determined two amounts that quantified the risk of the transactions.   Saraf Dep. at 34.   These two amounts are called "delta" and "vega."   Vega represents an amount by which the mid-market price would change if the volatility of interest rates changed by 1%, while delta represents an amount by which the mid-market price would change if interest rates change by 1 basis point ("bps").   *Id.* at 34.   Barclays' precise calculation is not clear from the record, but it appears that Barclays multiplied delta and/or vega by a factor of between 2.5 and 3, and then added the result to the mid-market price.   *Id.* at 53–55; *see* Expert Report of Plaintiff's Expert Marc Packles, Pl. Ex. 380, ECF 115-76 at ¶ 46.   The resulting figure was the Derivative Unwind Charge of $15,887,656.

Thornburg takes issue with "Barclays' unilateral decision to multiply the vega amounts by a factor of between 2.5 and 3, and to include any delta amount at all."   Opp. at 47.   According to Thornburg's expert, Marc Packles, the vega multiplier and the delta were "not substantiated by any documentation, and [they were] well beyond the range of what could be considered reasonable or good faith conduct."   *Id.*; *see* Packles Report at ¶¶ 43–50.   Packles stated in his

Report that the vega multiplier should have been "no greater than 0.6." Packles Report at ¶ 16. Using that vega, Packles opines that the Derivative Unwind Charge should have been $11.03 million, which Packles believes is "a good faith estimate of the upper boundary of what [Barclays] would be willing to pay a third-party dealer to replace the At-Issue Transactions." *Id.* ¶ 66.

The thrust of Barclays' argument in support of summary judgment is that, as Calculation Agent, Barclays was contractually vested with the unilateral right to calculate Termination Value. *See* Confirmation at 5 ("For purposes of determining the Termination Value in connection with the occurrence of an Event of Default, the Calculation Agent will be the non-defaulting party."); *id.* at 3 ("'Termination Value' shall mean the amount, determined by the Calculation Agent in good faith . . . ."). Thus, the only question before the Court is whether Barclays acted in good faith in making its calculation. Barclays contends that, although Thornburg has proffered evidence, in the form of an expert report, that Barclays' calculation may have been *incorrect*, it has not proffered any evidence that Barclays' calculation was made *in bad faith*. Ultimately, according to Barclays, Thornburg's breach of contract claim stemming from the Derivative Unwind Charge is merely a dispute over the quantum of the charge.

Although Barclays' point is well taken, two matters convince me that this issue is one for the jury's consideration.

First, Barclays failed to explain the basis for its use of a vega multiplier of between 2.5 and 3, and it has not replicated its calculation of Termination Value using that multiplier. *See* Saraf Dep. at 53–55, 58, 80–82. The lack of information in the record about why Barclays chose the multiplier it did makes it difficult to assess Barclays' good faith as a matter of law.

Second, the vega multiplier used by Barclays was more than four times larger than that recommended by plaintiff's expert.  Although not all discrepancies in calculations would be evidence of bad faith, the discrepancy here is so large that it at least raises a fact issue about Barclays' good faith.  In fact, even *Barclays*' expert estimated that the Derivative Unwind Charge should have been lower than Barclays calculated—he calculated it at between $13.1 million and $15.6 million, as opposed to the $15.9 million calculated by Barclays.  Oldfield Rebuttal at ¶ 92.  Accordingly, I will deny Barclays' motion for summary judgment with respect to the Derivative Unwind Charge.

The Repo Unwind Charge, which amounted to $2,762,389, was computed by multiplying the face, or "notional," amount of each transaction by an annual rate of 7 bps for the period from the alleged default date to the end of the lockout period for each transaction.  *See* Saraf Dep. at 241–43; Pl. Ex. 361, ECF 115-73.  A Barclays repo trader, Oscar Huettner, determined the Repo Unwind Charge.  *Id.* at 274:4–10.  Huettner explained that in the Repo Unwind Charge, he was capturing what he regarded as "lost profit" because the repo desk had expected to receive LIBOR + 1 or 3 bps (from the swaps desk) until the lockout date, and expected to finance that loan at approximately a 7 bps spread (*i.e.*, at LIBOR − 6 or 4 bps).  Deposition of Oscar Huettner, Pl. Ex. 42, ECF 115-44 at 92–97.

Thornburg highlights three facts which create a genuine factual dispute about whether the Repo Unwind Charge was calculated and charged to Thornburg in good faith.  First, Barclays never included the Repo Unwind Charge in its calculation of Termination Value until after the default.  As discussed, Barclays calculated Termination Value on a daily basis to determine whether it could issue a margin call.  Although that calculation always included a component to

account for the unwinding of the embedded derivatives, it never included a charge analogous to the Repo Unwind Charge.  Second, Thornburg points to an email sent by Huettner to Barclays' Product Control group in 2007.   In response to a question about whether the MRA or Confirmations supported the Repo Unwind Charge, Huettner wrote: "You will not find a reference to this in the repo agreement."  Pl. Ex. 357, ECF 115-71.  Third, Thornburg disputes the characterization of the Repo Unwind Charge as representing "lost profits," stating in its Opposition at 48–49:

> Furthermore, even if there were a contractual basis to recover "lost profits" based on the repo desk's expectation of being paid LIBOR + 1 or 3 bps by the swaps desk for financing the Thornburg repos, there is no evidence to support any lost profits.  Upon liquidation, Barclays recovered all the principal and interest Thornburg owed. Those funds were therefore available to be re-loaned, and Thornburg had the opportunity to do so at substantially better rates than LIBOR + 1 or 3 bps.

Frankly, Barclays has provided very little explanation about the nature of the Repo Unwind Charge.  Without more information about what the Repo Unwind Charge represents and how it was calculated, I cannot say whether it was supported by the MRA or calculated in good faith.  In short, the evidence in the record is insufficient to support a grant of summary judgment in favor of Barclays.  Accordingly, summary judgment will be denied as to the Repo Unwind Charge.

## Conclusion

For the foregoing reasons, Barclays' Motion for Summary Judgment will be denied. Thornburg's Cross-Motion will also be denied.  An Order follows.


Date: August 1, 2014                               _____/s/_____
                                                   Ellen Lipton Hollander
                                                   United States District Judge